William J. Maledon (#003670)
Brett L. Dunkelman (#006740)
Scott W. Rodgers (#013082)
OSBORN MALEDON, P.A.
2100 North Central Avenue
Suite 2100
Phoenix, Arizona  85012
(602) 640-9000
srodgers@omlaw.com

Stacy M. Gabriel (#015071)
Andrew S. Ashworth (#016356)
GABRIEL & ASHWORTH, P.L.L.C.
10105 E. Via Linda
Suite 103, No. 392
Scottsdale, Arizona 85258
(480) 368-2790
andrew@gabrielashworth.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Test Advantage, Inc., an Arizona corporation, | No.: |
| Plaintiff, | |
| vs. | **VERIFIED COMPLAINT** |
| Eric Paul Tabor and Ronni Tabor, husband and wife; and Rizon Software, L.L.C., an Arizona corporation, | **(Jury Trial Demanded)** |
| Defendants. | |

Plaintiff Test Advantage, Inc. ("Test Advantage"), through counsel undersigned, for its claims against Defendants Eric Paul Tabor, Ronni Tabor, and Rizon Software, L.L.C. ("Rizon"), alleges as follows:

Parties, Jurisdiction and Venue

1.  Plaintiff Test Advantage is an Arizona corporation that is authorized to and is doing business in Maricopa County, Arizona.

2.  Defendants Eric Paul Tabor and Ronni Tabor are husband and wife and

1   reside in the State of Arizona, Maricopa County.[1]  Upon information and belief, all

2   actions of Eric Paul Tabor ("Tabor") complained of herein were done by Tabor on his

3   own behalf and on behalf of his marital community.

4   　　　3.  Defendant Rizon is an Arizona corporation that is authorized to and is

5   doing business in Maricopa County, Arizona.

6   　　　4.  Test Advantage seeks relief in this case under the patent laws of the United

7   States.  This Court has exclusive subject matter jurisdiction over the patent claim

8   pursuant to 28 U.S.C. § 1338(a) and supplemental jurisdiction over the remaining

9   claims pursuant to 28 U.S.C. § 1367(a).

10   　　　5.  The events giving rise to this action occurred within the District of Arizona.

11   　　　6.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and

12   1400(b).

13   <u>General Allegations</u>

14   　　　7.  At all relevant times, Test Advantage has operated as a supplier of custom

15   configured automated semiconductor test equipment and software solutions for

16   semiconductor test, which it provides to clients throughout the world.  Test

17   Advantage's software division develops and markets software technology tools for

18   semiconductor test applications to its worldwide customer base.

19   　　　8.  Since the inception of its business in Arizona in 1997, Test Advantage has

20   developed a substantial amount of intellectual property, including various concepts,

21   inventions, technological developments, software code, information and products.

22   Test Advantage has carefully safeguarded its intellectual property, and has applied for

23   and obtained patents, copyrights and other protections for certain portions of its

24   intellectual property.

25   　　　9.  Maintaining the integrity of its intellectual property is crucial to the

26   ongoing success and viability of Test Advantage.

27   　　[1]  Ronni Tabor is named in her spousal and community capacities only.

2

28

10. Since the inception of its business in Arizona, Test Advantage has developed additional confidential and proprietary information relating to its customers, company concepts, business plans, pricing structure and work product so far as it relates to testing semiconductors. This information includes, but is not limited to, sales and marketing information, customer contact information, customer usage requirements, contract terms, manufacturing procedures and techniques, business plans and so forth ("Confidential Information").

11. Exposure of, and a competitor's use of, Test Advantage's Confidential Information will cause irreparable injury and loss.

12. Defendant Eric Paul Tabor is an experienced software engineer. He graduated with a degree in Electrical Engineering Technology in 1991. Since then, Mr. Tabor has worked continuously on various software development and other highly technical projects.

13. In or about August, 2000, Test Advantage and Mr. Tabor entered into discussions with a view to Mr. Tabor becoming an employee of Test Advantage. Prior to this time, Mr. Tabor had no experience with semiconductor test applications.

14. As part of these discussions, Mr. Tabor and Test Advantage entered into a written Agreement Regarding Confidential Information and Intellectual Property, dated August 23, 2000 ("the Confidentiality Agreement").

15. Pursuant to the Confidentiality Agreement, Mr. Tabor acknowledged that Test Advantage possessed certain Intellectual Property and Confidential Information (as defined in the Agreement), which was the sole and exclusive property of Test Advantage. Mr. Tabor agreed, inter alia, that he would not take any action which would tend to diminish or impair Test Advantage's rights in the Confidential Information and Intellectual Property, nor would he disclose or reveal the Confidential Information to anyone.

3

16. On or about September 1, 2000, Mr. Tabor accepted Test Advantage's offer of employment, and was hired in the position of Software Development Manager/MIS Operations Manager commencing September 15, 2000. Software development was a new initiative for Test Advantage, and Mr. Tabor was hired specifically to develop, lead and manage this aspect of the company's business.

17. Mr. Tabor's initial base salary was $113,000. By the time of his resignation in January 2005, his base salary had increased to $135,000. In addition to a base salary, Mr. Tabor received a signing bonus of $6,000. In addition, he was eligible for, and received, certain benefits, bonuses and other compensation. Mr. Tabor immediately became and remained the highest paid employee at Test Advantage outside of the Company's two founders.

18. As the Software Development Manager, Mr. Tabor reported directly to Test Advantage's Chief Executive Officer. He was responsible for all of Test Advantage's software activity and supervised a staff of up to 10 software engineers and developers and a number of outside contractors. At any given time, Mr. Tabor supervised 40%-60% of Test Advantage's workforce. As the direct supervisor of Test Advantage's software developers, he had intimate knowledge of the compensation structure, experience level and qualifications of the individuals under his supervision. All of Test Advantage's software development and design was undertaken with his input, oversight and direction. He had primary responsibility for selecting the software development technology and strategy that was used for any particular Test Advantage software initiative. In his capacity as Software Development Manager, Mr. Tabor became intimately familiar with all of Test Advantage's Intellectual Property and Confidential Information, and was identified as an inventor on the majority of Test Advantage's patent applications.

19. On September 13, 2000, Mr. Tabor acknowledged in writing that he had

4

received a copy of the Test Advantage Employee Manual ("the Employee Manual").

20. The Employee Manual provides, in part, that:

> I am aware that during the course of my employment, confidential information will be made available to me, i.e., product designs, marketing strategies, customer lists, pricing policies, and other related information. I understand that this information is critical to the success of Test Advantage and must not be given out or used outside of Test Advantage's premises or with non-Test Advantage employees. In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

21. On or about May 31, 2001, Mr. Tabor and Test Advantage entered into a further written agreement, pursuant to which Mr. Tabor acknowledged, inter alia, that any intellectual property that he, alone or jointly with others, created, conceived or which was first made in connection with his engagement by Test Advantage shall be the sole and exclusive property of Test Advantage ("the Intellectual Property Agreement").

22. Pursuant to the Intellectual Property Agreement, Mr. Tabor assigned and agreed to assign to Test Advantage all right, title, and interest in and to all such intellectual property.

23. Pursuant to the Intellectual Property Agreement, Mr. Tabor further agreed that he would not use or disclose any confidential information belonging to Test Advantage, and that any such unauthorized disclosure would cause irreparable injury to Test Advantage.

24. During the course of his employment with Test Advantage, Mr. Tabor worked on numerous software initiatives targeting data analysis solutions for the semiconductor manufacturing and test markets. This work included the Express and Streetwise applications, which Test Advantage now offers for commercial sale, as well as the Concierge application, which is still under development. Express is an off-line test engineering application that offers comprehensive analysis of large

5

volumes of test data to generate automated recommendations for test corrective actions and test efficiency through extensive data point correlation. Streetwise is a sophisticated software tool used by manufacturers of semiconductor devices to analyze multiple millions of device test data points from automated test equipment (ATE) and identify "outlier" devices that pose quality risks. Streetwise works both off-line and in-production-line, and supports, among other things, industry requirements for statistical bin limits and part average testing. Streetwise allows the user to perform detailed 3D wafer views and validation of the sorting, data filtering, and view summary statistics as a result of the Streetwise data analysis. The Concierge application performs data analysis on semiconductor test data creating a signature that can be correlated back to the quality of semiconductor front end manufacturing processes. The application creates a closed loop feedback capability by tracking the end result performance of the semiconductor devices at the wafer level to front end manufacturing process variances.

25. Mr. Tabor was the lead engineer and was integrally involved in the design and development of the Express, Streetwise and Concierge applications, which specifically target the semiconductor manufacturing and test marketplace. Mr. Tabor was also heavily involved in marketing these applications to Test Advantage's customers. Test Advantage has spent years working on these software development applications, and invested millions of dollars, all under Mr. Tabor's direction and control.

26. Mr. Tabor resigned his employment from Test Advantage, effective January 28, 2005. At the time of Mr. Tabor's resignation, he indicated that it was his intention to pursue a non-competitive opportunity in the bio-technology field.

27. It was agreed that Mr. Tabor would continue to work for Test Advantage as a full-time consultant after his employment ended. To confirm the nature of the

6

ongoing relationship, Test Advantage and Mr. Tabor entered into a written agreement dated January 28, 2005 ("the Post-Employment Agreement").

28. Pursuant to the Post-Employment Agreement, Mr. Tabor acknowledged that he continued to have an obligation to maintain the confidentiality of Test Advantage information in accordance with the Employee Manual.

29. Pursuant to the Post-Employment Agreement, Mr. Tabor further acknowledged that the terms of both the Confidentiality Agreement and the Intellectual Property Agreement would remain in effect and would apply to any work Mr. Tabor performed for Test Advantage as a consultant, including software development, training and support.   Mr. Tabor received another copy of   the Confidentiality Agreement and Intellectual Property Agreement at the time of his resignation.

30. Between February and July, 2005, Mr. Tabor performed consulting work for Test Advantage on a full time basis, including continuing software development and customer presentations on the Express and Streetwise applications.

31. Test Advantage paid Mr. Tabor approximately $60,000 for consulting services between February and July 2005.   The purchase orders reflecting these payments specifically reference the fact that the terms of the Confidentiality Agreement and Intellectual Property Agreement applied to the consulting work performed by Mr. Tabor.  Mr. Tabor was copied on the purchase orders.

32. Upon information and belief, Mr. Tabor is a manager and member of Defendant Rizon.  Rizon was incorporated in Arizona on or about April 21, 2005.

33. In or about April 2005, Test Advantage learned that Mr. Tabor, through Rizon, had developed a software program named Compass. Compass is described by Rizon as a semiconductor software tool that provides reporting and analytical capabilities to a wide set of needs in semiconductor engineering.   Rizon offers

Compass as a free download from its website.

34. Upon information and belief, Mr. Tabor and Rizon have misappropriated Intellectual Property and Confidential Information belonging to Test Advantage in developing the Compass software.

35. Upon learning of the existence of Compass, Test Advantage immediately expressed its concern to Mr. Tabor. Mr. Tabor represented to Test Advantage that he still intended to pursue an opportunity in the biotechnology field, and that he had written Compass solely as a self-marketing tool to showcase his skills as a programmer.

36. Mr. Tabor offered to license a portion of Compass to Test Advantage, however Test Advantage chose not to do so.

37. Test Advantage determined that, although Compass was developed by Mr. Tabor in violation of his agreements with Test Advantage, Compass did not pose an immediate competitive threat to any of Test Advantage's products. Additionally, as of April 2005, Mr. Tabor was still providing vital consulting services to Test Advantage with respect to the Streetwise program, thereby hampering Test Advantage's ability to enter in to an adversarial position with Mr. Tabor.

38. On or about September 22, 2005, Test Advantage learned that Mr. Tabor, through Rizon, was marketing a software program that he had developed named Compass Pro. Compass Pro contains significantly more advanced features than Compass. Like Streetwise and Express, Compass Pro provides for the analysis of ATE (Automatic Test Equipment) STDF (Standard Test Data Format) binary data and custom text files specific to the semiconductor manufacturing and test market. Also like Streetwise and Express, Compass Pro performs test data analysis for failure population filtering, outlier population filtering, capability analysis, and test data correlations. Finally Compass Pro provides extensive reporting tools for sorting, data

filtering and summary statistics, as do Streetwise and Express.  The local outlier detection feature of Compass Pro (which is described as a geo-spatial process by Compass Pro) is technology developed by Test Advantage and is known by Mr. Tabor to be a feature that is of critical importance to Test Advantage's customers, and which provides a competitive advantage to Test Advantage's applications.

39.  Upon information and belief, Mr. Tabor and Rizon have misappropriated Intellectual Property and Confidential Information belonging to Test Advantage in developing the Compass Pro software.

40.  The Compass Pro software poses a direct and immediate competitive threat to the Express and Streetwise applications of Test Advantage.

41.  On September 20, 2005, Mr. Tabor sent a generic email to a number of Test Advantage customers announcing the release of Compass Pro.  Mr. Tabor directed the email to the specific individual(s) at the customers with whom Mr. Tabor had dealt during his employment and subsequent consulting relationship at Test Advantage.

42.  Mr. Tabor's email of September 20, 2005 directs recipients to the Rizon website, which contains detailed information about Compass Pro, and is touted by Rizon as providing "the best capability and value in data analysis for semiconductor engineering."

43. On September 20, 2005, Mr. Tabor sent an additional email to Michel Buffa, one of Test Advantage's primary client contacts at ST Microelectronics ("ST"), in which he touts the virtues of the Compass Pro product.  In that email, Mr. Tabor specifically references his "intimate knowledge of ST's engineering and productions needs. . . ."  He also notes that his company's "products are priced, in some cases, several orders of magnitude less than comparable competitive solutions." Mr. Tabor's knowledge of ST's engineering and production needs and Test

9

Advantage's competitive pricing structure was acquired exclusively through his employment at Test Advantage.

44. Upon information and belief, Mr. Tabor has sent similar messages to other customers of Test Advantage.

45. The identity of Test Advantage's customers, including the specific contacts at those customers and the semiconductor test needs and applications of those customers, is Confidential Information belonging to Test Advantage, and is known to Mr. Tabor only by reason of his work for Test Advantage. Mr. Tabor's use of this information is in blatant violation of his agreements with Test Advantage to safeguard this Confidential Information.

46. Mr. Tabor has misappropriated Intellectual Property and Confidential Information belonging to Test Advantage to develop both the Compass and Compass Pro software. Mr. Tabor has further misused Intellectual Property and Confidential Information belonging to Test Advantage to market and sell the Compass and Compass Pro software.

47. Mr. Tabor's misappropriation of Test Advantage's Intellectual Property and Confidential Information is in violation of numerous written agreements between Mr. Tabor and Test Advantage, and also violates other common law and statutory rights of Test Advantage.

48. Mr. Tabor's misappropriation was done with the full knowledge and consent of Rizon, which has knowledge of the agreements between Mr. Tabor and Test Advantage.

49. Upon information and belief, Mr. Tabor was working on the Compass and Compass Pro products while he was still a full time employee of Test Advantage.

50. Because Mr. Tabor was working on these applications while still employed by Test Advantage, and because he misappropriated Intellectual Property and

10

Confidential Information belonging to Test Advantage in developing these applications, Test Advantage is the legal owner of all intellectual property rights associated with Compass and Compass Pro. Mr. Tabor's and Rizon's attempts to market these applications without the consent of Test Advantage violates Test Advantage's rights in these applications.

51. Upon information and belief, Mr. Tabor diverted and misdirected certain aspects of the software development programs of Test Advantage while he was still a full time employee of Test Advantage. This misdirection was done by Mr. Tabor with an intent to compete with Test Advantage and to obtain an improper competitive advantage against Test Advantage at such time as he left its employ.

52. The improper and unlawful acts of Mr. Tabor and Rizon have caused, and, unless restrained, will continue to cause, substantial harm to Test Advantage.

### Count One – Breach of Contract (Tabor – Confidentiality Agreement)

53. Test Advantage incorporates by reference the allegations in paragraphs 1 through 52 of this Complaint as though fully set forth herein.

54. Under the terms of the Confidentiality Agreement, Mr. Tabor agreed that that he would not take any action which would tend to diminish or impair Test Advantage's rights in its Confidential Information and Intellectual Property, nor would he disclose or reveal the Confidential Information to anyone.

55. Mr. Tabor has misappropriated Intellectual Property and Confidential Information belonging to Test Advantage in designing, developing, marketing and distributing the Compass and Compass Pro products.

56. Mr. Tabor's actions are a material breach of the Confidentiality Agreement.

57. As a consequence of Mr. Tabor's breach of contract, Test Advantage has sustained damages and will continue to sustain damages in an amount to be

11

1    determined at trial.

2        58. Test Advantage will continue to suffer irreparable injury unless Mr. Tabor

3    is enjoined and restrained from continuing to violate the express terms of the

4    Confidentiality Agreement.    Test Advantage's damages cannot be adequately

5    compensated solely through money damages, thereby entitling Test Advantage to

6    equitable relief in the form of an injunction.

7        59. Mr. Tabor acknowledged in the Confidentiality Agreement that any

8    unauthorized disclosure or use of Test Advantage's Confidential Information would

9    cause Test Advantage immediate and irreparable injury or loss.

10       60. The Confidentiality Agreement provides that in any action or proceeding

11   to enforce rights thereunder, the prevailing party will be entitled to recover costs and

12   reasonable attorney's fees from the other party.

13       61. Because this matter arises out of contract, Test Advantage is also entitled

14   to recover its costs and reasonable attorneys' fees pursuant to A.R.S. § 12-341.01.

15   **Count Two – Breach of Contract (Tabor – Intellectual Property Agreement)**

16       62. Test Advantage incorporates by reference the allegations in paragraphs 1

17   through 61 of this Complaint as though fully set forth herein.

18       63. Under the terms of the Intellectual Property Agreement, Mr. Tabor agreed

19   that that he would assist Test Advantage in every proper and legal way in order to

20   obtain, maintain and protect Test Advantage's rights in its Intellectual Property.  Mr.

21   Tabor further agreed that he would not at any time use or disclose any confidential

22   information relating to or belonging to Test Advantage.

23       64. Mr. Tabor has misappropriated Intellectual Property and Confidential

24   Information belonging to Test Advantage in designing, developing, marketing and

25   distributing the Compass and Compass Pro products.

26

27                                    12

28

65. Mr. Tabor's actions are a material breach of the Intellectual Property Agreement.

66. As a consequence of Mr. Tabor's breach of contract, Test Advantage has sustained damages and will continue to sustain damages in an amount to be determined at trial.

67. Test Advantage will continue to suffer irreparable injury unless Mr. Tabor is enjoined and restrained from continuing to violate the express terms of the Intellectual Property Agreement. Test Advantage's damages cannot be adequately compensated solely through money damages, thereby entitling Test Advantage to equitable relief in the form of an injunction.

68. Mr. Tabor acknowledged in the Intellectual Property Agreement that any unauthorized disclosure or use of Test Advantage's Confidential Information would cause irreparable injury to Test Advantage.

69. Because this matter arises out of contract, Test Advantage is entitled to recover its costs and reasonable attorneys' fees pursuant to A.R.S. § 12-341.01.

### Count Three – Tortious Interference with Contract (Rizon)

70. Test Advantage incorporates by reference the allegations in paragraphs 1 through 69 of this Complaint as though fully set forth herein.

71. At all material times, Rizon was aware that Test Advantage and Mr. Tabor were parties to the Confidentiality Agreement and the Intellectual Property Agreement.

72. Through its actions in designing, developing, marketing and distributing the Compass and Compass Pro software programs, Rizon has intentionally, improperly, wrongfully and maliciously interfered with Test Advantage's contractual relations with Mr. Tabor.

73. Rizon's interference is neither justified, privileged nor excusable.

74. As a direct and proximate result of Rizon's interference, Test Advantage has suffered damages in an amount to be proven at trial. Test Advantage will continue to suffer irreparable injury unless Rizon is enjoined and restrained from further interference. Test Advantage's damages cannot be adequately compensated solely through money damages, thereby entitling Test Advantage to equitable relief in the form of an injunction.

### Count Four – Misappropriation of Trade Secrets (all Defendants)

75. Test Advantage incorporates by reference the allegations in paragraphs 1 through 74 of this Complaint as though fully set forth herein.

76. Test Advantage's Intellectual Property and Confidential Information constitute trade secrets within the meaning of A.R.S. §44-401. These items have independent economic value because they are not generally known to, and not readily ascertainable by proper means by other persons who can obtain economic value from their use. Test Advantage has made, and continues to make, reasonable efforts to maintain the secrecy of these items. At no time has Test Advantage given its consent, express or implied, that Mr. Tabor, Rizon or others may use or disclose Test Advantage's trade secret information.

77. As an employee and consultant of Test Advantage, Mr. Tabor had a duty to not disclose Test Advantage's trade secret information for any purpose other than for the benefit of Test Advantage. Tabor had a duty, and continues to have a duty, to maintain the secrecy of Test Advantage's trade secret information.

78. Both Mr. Tabor and Rizon have misappropriated trade secrets of Test Advantage by disclosing such information and/or using such information for their own benefit or for the benefit of others without the express or implied consent of Test Advantage. Moreover, in connection with his ongoing work for Rizon, Mr. Tabor will inevitably disclose trade secret and confidential information belonging to Test

14

Advantage, and he should be enjoined from this improper conduct.

79. At the time of Defendants' disclosure and/or use of Test Advantage's trade secrets, Defendants knew or had reason to know that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy.

80. Defendants' misconduct is in violation of the Uniform Trade Secrets Act, A.R.S. § 44-401, et. seq.

81. Defendants' misappropriation of Test Advantage's trade secrets was willful and malicious entitling Test Advantage to exemplary damages as set forth in A.R.S. § 44-403.

82. As a direct and proximate result of Defendants' misconduct, Test Advantage has suffered damages, Defendants have been unjustly enriched in amounts to be proven at trial, and Test Advantage has suffered irreparable competitive injuries. Test Advantage is also entitled to recover its costs and attorneys' fees pursuant to A.R.S. § 44-404.'

### Count Five – Breach of Duty of Loyalty (Tabor)

83. Test Advantage incorporates by reference the allegations in paragraphs 1 through 82 of this Complaint as though fully set forth herein.

84. Mr. Tabor owed a duty to Test Advantage not to compete with Test Advantage and not to take actions inconsistent with the best interests of the company.

85. While he was employed by Test Advantage, Mr. Tabor was working on the Compass and Compass Pro products with a view to exploiting this work for his own personal gain. In doing so, Mr. Tabor breached his duty of loyalty to Test Advantage.

86. While he was employed by Test Advantage, Mr. Tabor diverted and misdirected certain aspects of the software development programs of Test Advantage. This misdirection was done by Mr. Tabor with an intent to compete with Test Advantage and to obtain an improper competitive advantage against Test Advantage

15

at such time as he left its employ.  In doing so, Mr. Tabor breached his duty of loyalty to Test Advantage.

87. As a direct and proximate result of the breach of duty of loyalty by Mr. Tabor, Test Advantage has suffered damages in an amount to be proven at trial, and has suffered irreparable injury.  Additionally, Test Advantage is entitled to have Mr. Tabor disgorge and return all salary, benefits, bonuses, and other perquisites of his employment relationship with Test Advantage during the period in which Mr. Tabor was breaching his contractual and statutory obligations to Test Advantage.  Because Mr. Tabor and Rizon have been unjustly enriched by the misconduct of Mr. Tabor at the expense of Test Advantage, Test Advantage is entitled to the imposition of a constructive trust for all proceeds that Mr. Tabor or Rizon have directly or indirectly derived from this misconduct.

88.   Upon information and belief, Mr. Tabor acted with an evil mind, with malicious intent, and/or with a reckless disregard for the rights of Test Advantage and the certainty that his conduct would cause harm to Test Advantage.  As a result of Mr. Tabor's conduct, Test Advantage is entitled to an award of punitive damages.

### Count Six – Declaratory Relief (all defendants)

89. Test Advantage incorporates by reference the allegations in paragraphs 1 through 88 of this Complaint as though fully set forth herein.

90. Upon information and belief, Mr. Tabor was working on the Compass and Compass Pro products while he was still a full time employee of Test Advantage.

91. Because Mr. Tabor was working on these applications while still employed by Test Advantage, and because he misappropriated Intellectual Property and Confidential Information belonging to Test Advantage in developing these applications, and further that the Intellectual Property Agreement provides that all such rights are assigned to Test Advantage, Test Advantage asserts that it is the legal

16

owner of all intellectual property rights associated with Compass and Compass Pro. Mr. Tabor's and Rizon's attempts to market these applications without the consent of Test Advantage violates Test Advantage's rights in these applications.

92. Under the circumstances set forth above, a controversy of a justiciable nature exists as to Test Advantage's  legal rights regarding the ownership of the Compass and Compass Pro software applications.

93. Pursuant to 28 U.S.C. § 2201, and Rule 57, Federal Rules of Civil Procedure, Test Advantage is entitled under the circumstances set forth above to have this Court declare that neither Mr. Tabor nor Rizon have an ownership interest in the Compass and Compass Pro applications, and that Test Advantage is the rightful owner of these applications.

## Count Seven – Patent Infringement (all defendants)

94. Test Advantage incorporates by reference the allegations in paragraphs 1 through 93 of this Complaint as though fully set forth herein.

95. United States Patent No. 6,792,373 (the "Tabor Patent") was lawfully issued on September 14, 2004.  A true and correct copy of the Tabor Patent is attached hereto as Exhibit A.  Mr. Tabor is listed as the Inventor on the Tabor Patent. Test Advantage is the owner by assignment of the Tabor Patent.

96. Mr. Tabor and Rizon have engaged in direct infringement, contributory infringement, and/or inducement of infringement of one or more claims of the Tabor Patent, all in violation of 35 U.S.C. § 271.  Such infringement was without license from Test Advantage and was willful and deliberate, with knowledge of the Tabor Patent.

97. Test Advantage demands a jury trial.

WHEREFORE, Plaintiff requests that this Court enter judgment in its favor and against all Defendants, as follows:

17

A.   For an Order temporarily and permanently enjoining and restraining Defendants, their agents, employees, affiliates and all those acting in concert with them, from disclosing, divulging or utilizing Test Advantage's Intellectual Property and Confidential Information, including client information.

B.   For an Order temporarily and permanently enjoining and restraining Defendants, their agents, employees, affiliates and all those acting in concert with them, from engaging in direct infringement, contributory infringement, and inducement of infringement of the Tabor Patent.

C.   For an Order temporarily and permanently enjoining and restraining Defendants, their agents, employees, affiliates and all those acting in concert with them, from advertising, marketing, or otherwise publicizing, soliciting or distributing the Compass and Compass Pro software programs.

D.   For an Order temporarily and permanently enjoining and restraining Defendants, their agents, employees, affiliates and all those acting in concert with them, from contacting or soliciting, directly or indirectly, Test Advantage's customers.

E.   For an Order that Defendants, their agents, employees, affiliates and all those acting in concert with them, be required to deposit with this Court any and all Test Advantage property, and all copies thereof, within their possession, custody or control.

F.   For the imposition of a constructive trust as to all proceeds that Defendants have directly or indirectly derived or earned for themselves or others from their misconduct.

G.   For an Order disgorging Mr. Tabor of all compensation paid to him,

18

including but not limited to salary, consulting fees, benefits, bonuses, and other perquisites of his employment and consulting relationship with Test Advantage during the period in which Tabor was breaching his contractual and statutory obligations to Test Advantage.

H.  For a declaration that neither Mr. Tabor nor Rizon have an ownership interest in the Compass and Compass Pro applications, and that Test Advantage is the rightful owner of these applications.

I.  For Test Advantage's actual damages in an amount to be proven at trial, including such damages as it may be entitled pursuant to 35 U.S.C. § 284, trebled by virtue of Tabor's willful and deliberate infringement.

J.  For punitive and exemplary damages in an amount sufficient to punish Defendants and to deter them and others from such conduct in the future.

K.  For pre-judgment and post-judgment interest at the maximum rate allowed by law.

L.  For Test Advantage's attorneys' fees and costs pursuant to applicable law, including, without limitation, 35 U.S.C. § 285.

M.  For such other and further relief as the Court deems just and proper.

DATED this 25th day of October, 2005.

By:    s/ Scott W. Rodgers
        William J. Maledon
        Brett L. Dunkelman
        Scott W. Rodgers
        OSBORN MALEDON, P.A.

        Stacy Gabriel
        Andrew S. Ashworth
        GABRIEL & ASHWORTH, P.L.L.C.

        Attorneys for Plaintiff

## VERIFICATION

1.    I am an officer of Test Advantage, the Plaintiff in this action.

2.    Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America that the facts stated in the foregoing complaint are true and correct to the best of my information and belief.

Executed on October 25, 2005.

Capri DeModica

21